Good afternoon, Illinois Appellate Court, First District. Court is now in session. The First Division, the Honorable Justice Carl Anthony Walker presiding. Case number 1-8-0909, Barry Ring versus Richard Schrenker. Good afternoon, everyone. I'm Justice Walker and I have here with me today Justice Hyman and Justice Coughlin and we're going to start by asking the Good afternoon, Your Honors. Gary Hollander appearing on behalf of the Defendant Appellate Cross Appellant, Richard Schrenker. Good afternoon, Steve Greenberg appearing on behalf of the Appellant, Mr. Ring. And Mr. Greenberg, I know that you filed an appearance very recently. We just wanted to be clear that a copy of that appearance was forwarded to Mr. Hollander. A copy of that appearance was forwarded to Mr. Feldman, I believe, at Straus and Malk. We tried filing the appearance for the last couple of days and because the Odyssey system only has a tab for a $30 fee and it was a $50 fee. They finally today, the clerk's office said to file it as a docketing statement. So I filed it to, I forwarded it to Mr. Feldman, who was on the proof of service that I had. I did not receive it. I can re-forward it to Mr. Hollander. Mr. Feldman is also listed as an attorney of record. And that's fine. That's an appropriate way to send it. But go ahead and send it now while we're preparing to get the argument started. Mr. Greenberg to Mr. Hollander. Yeah, that's fine. I'm obviously prepared to go ahead. Can you put your email in the chat because I don't have it. Rather than taking the time to do that, I don't mind having it sent to me afterwards. I'm ready to proceed. That's good. Okay. So, Mr. Hollander, at this point, you have no objection to Mr. Greenberg appearing on behalf of Mr. Ring, correct? Correct. No objection. Okay. All right. Good. So, let me ask, Greenberg, we'll start with you. Approximately how much time will you meet today, Mr. Greenberg? I was told that the total argument was 25 minutes aside. It's 20 minutes, Mr. Greenberg. I would ask for maybe 12 minutes to start and reserve eight for rebuttal. Sure, you can do that. Okay. And Mr. Hollander, how much time do you also have a total of 20 minutes? I'll try to do 15 and five. That would be great. We generally don't give you time to do any rebuttal, Mr. Hollander, so it'll be just your total time would be the 20 minutes. Okay. All right. With that, Mr. Greenberg, we're going to ask you to please get us started. Thank you. And I apologize. The lights are from the ceiling, so it's not we don't have spotlights on ourselves. Good afternoon, justices. So I got asked, as you indicated at the last minute to come into this and I started looking at it. I tried to figure out what happened. We have a gentleman who sues his former father in law, who acted as his attorney and his accountant for the entire period of the marriage up until a divorce was filed. And he sues him for malpractice. Now, that's probably a little bit strikes us as maybe a little bit extreme, a little bit overboard. But when you look at what happened here, it's perfectly warranted. And the trial court's decision that he had not proven his case is not supported by any of the evidence in the case. First of all, we have the former father in law, Mr. Shanker, who is providing information, starting on the day that his daughter is proceeding with her divorce about a project that Dr. Ring is doing in Holbrook, Indiana. Well, let's stop right there. So the TRO is June 25th, 2013, right? Yes. Okay. So what did the defendant do, according to you, prior to 6-25-13? So he disclosed information to the lawyers for his daughter. There are a series of emails that were admitted into evidence that show that he was communicating with them. You say that the dates of those emails were before June 25th? Yes. Yes. They're all before June 25th. And he knew, so he knew that Dr. Ring wanted to develop this property, and he knew that this was Dr. Ring's weak spot. That this was something that had to get done, that he wanted people, he wanted to get done, he was under strict time limits, and he started to communicate with Carol's divorce lawyers right away, saying, this is where he's weak. Carol had signed a prenuptial agreement. She was destined to get nothing. Whether that was a good agreement or a bad agreement was a matter for the divorce court to decide. So what they did was they went in, almost in an extortion effort, and they said, he said, I'm going to give this information to Carol's lawyers. They're going to bring this project to a halt. This project, which has nothing to do with the marriage. And when they bring this project... There's testimony that really that had nothing to do with what was going on here, because he had really frozen her out of any money. There had been some words exchanged with regard to Carol and her father and Ring. So, wasn't that what was going on here? Rather than... In effect, Carol knew all about this transaction. It was in her name. Well, Carol knew that the project existed, but Carol didn't know the details of it. She didn't know the time limits. She didn't know what the city council was doing. She didn't know about the construction. She didn't know about any of those things. Did her father represent her in this transaction? No, he did not. He represented Dr. Ring. Who represented her? No one. No one represented her. She had no representation, but her husband did on a transaction in which she gets... Her name's involved and she's involved? That appears to be the case, but that's not really the issue here. I understand that someone may look at this and think that it is a little bit unfair, a little bit tawdry, what was going on. But that's not really what matters. What matters is we have a lawyer who was the father of the wife and the father-in-law of the husband, and he made a decision that in that capacity as a lawyer, he could represent the husband in these transactions. And he knew that his own daughter wasn't represented in the transactions. The judge rejected that. I think there was just one, if I'm not mistaken, I thought it was testimony, maybe one email may have gone a little too far and violated the attorney ethics rules. And the judge didn't find that as being significant enough to do anything about this. Why shouldn't we just... What's the basis for reversal of the judge's decision? Because it wasn't just one email. It was his... The other emails weren't found to be a violation. The fact that there were other emails, yeah, there were several emails, but my understanding from reading the record and the briefs, tell me if I'm wrong. With all due respect, I think you are wrong. The judge doesn't reference in his decision any particular emails. In fact, he says that there was nothing at all. And I'm looking at the opinion. He says that the father-in-law didn't share anything, didn't share any information at all. And he had to have because this was the sweet spot. If you know... Why do you think he had to? Again, I'm not sure I get that because she knew about the transaction. She did know about the transaction, but there were a lot of businesses that Dr. Ring was involved in. This is the one that's in the initial ex parte TRO. But there isn't a secret. It's no secret that this transaction took place. That's a public knowledge. She knew about it. Right. Again, where's the fire? The fire is because he knew from his work as an attorney, and this is borne out by the record, that this was the weak spot. This was the one business. So by doing this, by throwing a halt in this project, ultimately, they had to settle the case. They ended up settling the divorce case. And the divorce lawyer was quite clear in his testimony. Again, contrary to what the trial court said, the divorce lawyer was quite clear when he said that I think I would have been able to enforce the prenuptial agreement in this case. However, however, they were holding this Hobart property over his head. And because they were holding this property over his head, and they had this stranglehold on him, they knew his weak spot. But let's look at the testimony of Carol's attorney who said it's not uncommon in a divorce case, or the beginning of the case, in particular in this case. Carol was cut off from credit cards. I believe the remaining amount of money in the joint account had been removed. There's also I believe an attempt to mortgage a property. And given the situation and the very short period of time, the safest thing to do was to get a TRO. So nothing you said is in what she said. So I mean, this focus on the lawyer or the ring doesn't really help. Well, the judge can look at the testimony before him and rely on what Ms. Cotts said. But they didn't go in. Justice Simon, they didn't go in and try and mess with everything. First of all, the mortgage of the property. Why would they mess with everything? All she was doing was waiving her homestead in the property. That was all he was asking her to do. So they weren't mortgaging some property that she had some great interest in. It's if you look at it, you say, okay, in every divorce case or every divorce case involving a lot of money. Yes, they go in and they and they get a TRO, but they not only got the initial TRO, but then they follow it up with then there's another series of emails. Mr. Greenberg, we are all over the place right now. Can we focus on the issues in this case? Sure. You've raised four issues in this case. So now which one of those issues do you want to argue first? Because right now we are all over the place. Okay. Otherwise we'll never get through it. Well, what the court ultimately said is the court said there were no damages. Which issue are you going to start off arguing? Which of your four issues that you've raised on appeal are you starting with? The issue of damages. Let's go. Okay, let's go. So the court found that there were no damages in the case. That was also erroneous. There was the $400,000 settlement that had to be paid as a result of the TRO and the divorce testimony, the divorce lawyer's testimony. Mr. Mirabelli was clear in that regard. He said that we had to pay this money because it was cheaper than fighting the TRO and then trying to stop everything. That doesn't have anything to do, unless the other things we're talking about come into play, that doesn't happen. It happens all the time. I mean, that's a decision. That was a strategic decision because of the TRO. And I still don't see where Richard did anything. According to your client testified that in July 2013, Richard said to Barry, you don't want to F with me and my daughter. I know too much about your business practice. That's July 2013. The TRO again was in June. Again, I don't see where this case is going because things are happening after the fact. All the emails are before, not according to the briefs I read. I will get the sites for you. A lot of the information came about after the TRO was filed. So, in light of that, again, why do we, where's the basis for the court on these decisions? Because you have to get, it's still malpractice, it's malpractice to divulge confidential information. The judge didn't find it, did he? Well, but all the experts agreed that there had been a disclosure of confidential information. All the experts agreed? The three experts all said that Rule 1.9 would require you to not take a position adverse to your former client. And it is clear that Richard, by providing assistance to his daughter's divorce lawyers, was taking a position adverse to his former client. Again, we don't know he did that before June. I don't think it only matters that he did it before the exact date of the TRO. It matters that he did it also after that first date when the second order was in place. How can you say that? That one I really don't understand because you're talking about the TRO. All of this has to do with the TRO. If there was no TRO, then you said, Belli said, you know, there went up in the settlement and a whole horde of thousands. So, everything depends on that TRO. I'm thinking about this case. Whatever happened has to be, as a matter of law, before the TRO. Anything afterwards is after the fact. Or the preliminary injunction. The TRO turned into a preliminary injunction. I know, but the TRO came first. The conduct was ongoing. So, he assisted him in getting the TRO and then provided additional information. So, you didn't give him the TRO? I'm trying to find out. What did he do? Where was the testimony that said he did something? He provided information about this property to the lawyers. He provided information about the strategy. He provided information about them wanting to develop it. And, as I said, I will get you the citation to those emails. You don't have to. I mean, we have the briefs. We'll find out when Mr. Hollinger hits. The other thing I just want to touch on very briefly is the sanctions motion. Because the sanctions motion was based on the fact, again, that the judge did not believe there were any damages. And I think that there's a distinction between believing that there aren't any damages and that the claim was just entirely frivolous as to damages. After all, there were motions to dismiss where these things were litigated. There was a trial where there was testimony. Obviously, the judge rejected the testimony about whether or not there was damages. He didn't believe that the ring had been damaged at all, that ring had been delayed or anything of that sort. But that doesn't make what he was doing frivolous, and it certainly shouldn't make him responsible for it. He had a belief that as a result of the disclosure of information, that he had been damaged, and he articulated it. Maybe the court rejected it, but he articulated it. The court never found that the underlying allegations of wrongdoing were frivolous. And it didn't base its sanctions finding on a belief that he never should have brought the lawsuit in the first place because there had not been a breach of confidentiality. He felt that the problem, that the issue that he was faced with was that ring hadn't proved the damages, and that wasn't a frivolous issue at any rate. Well, he produced no evidence. It's not a question of proving damages, Matt. He didn't even provide any evidence. Justice, he did provide evidence. He testified to his feeling that he had to settle. His divorce lawyer testified to his belief that there was this pressure and they had to settle so the project could go ahead. He testified that he had to extend his office lease. He testified that he had to do construction in the winter months. They had to do site work that they wouldn't otherwise have had to do. Now, the fact that that maybe it didn't raise to the level of proof, maybe the lawyer should have, you know, they didn't present the divorce lawyers bills. That was one of the things the judge cited the lawyer who didn't get sanctioned. Maybe he should have produced those bills just as you would do. I that's certainly the way I would have done it. I would have had the bills and said, here's your bills. If you want to reserve that. Yes, please. Thank you, Mr. Greenberg. Mr. Hollander. May it please the court. So I know Mr. Greenberg is new in this case, but he is very mistaken about the information regarding the TRO, which as Justice Hyden has mentioned, that's what this case is about. It's the TRO and it's really about Dr. Ring's misstatements about the TRO. So the TRO was entered in June of 2013. I don't, but Justice Walker, Mr. Greenberg, I can't see him. And I don't know why his blank, whether he's there or not. I don't think he should. I don't think he should. Thank you, Justice Hyden. I didn't notice that Mr. Greenberg had turned his camera off. Mr. Greenberg, we do require the lawyers keep their cameras on the entire time. And Justice Walker, I'm having a lot of problems understanding Mr. Hollander. He's kind of going in and out. It's kind of muffled. And is anyone else having a problem with that? I am also, Justice Skaggling. So Mr. Hollander, I don't know if you can move closer to your microphone. You have to look at me more. I'm sorry. That's worse. Whatever you just did, it's worse now. Is this better now? It's about the same. We'll try to struggle through it. I'm not sure we can fix it. I will talk slow and try to enunciate better than I have been. That may help. Okay. So the TRO ex parte was entered in June of 2013. Mr. Schenker had nothing to do with the entry of the TRO. The evidence was undisputed as to that. Carol's divorce attorneys did that, as pointed out before, because Dr. Ring had closed the credit card account that Carol used to pay her and her family's expenses. And so, Mr. Schenker was shunning out of a bank account, trying to mortgage a property and threatened to dissipate his assets to her. So it was routine to go ahead with the TRO. The ex parte TRO did not have any restrictions on the Indiana property, which I call the Colville property. Had no restrictions on it whatsoever related to Colville. July 3rd, within a week of when the ex parte TRO was entered, Mr. Mirabelli appeared in court for Dr. Ring, and there was an agreed order modifying the TRO. And again, with no restrictions on the Colville property. On July 9th, there was a hearing in court between the parties. And the TRO was modified to put restrictions on both Dr. Ring and Carol stopping either one of them from doing anything with the Colville property because they both had an interest in the property. That was July 9th, 2023. August 30th, 2013, I'm sorry. August 30th, 2013, the TRO was dissolved. It was replaced by a preliminary injunction order that had nothing to do with Colville. There were no restrictions on Colville in that order. So the Colville restrictions lasted less than two months from July 9th, 2013 to August 30th, 2013. Dr. Ring and Carol settled the case with the signed settlement agreement March 2014, seven months later. The TRO had nothing to do with the settlement. There were no restrictions on Dr. Ring for the seven months leading up to the restriction. Council also stated that Mr. Schenker did something wrongful by talking about Colville to Carol's attorneys. And he said Carol didn't know the details of Colville. Carol drove through Indiana with Dr. Ring with her husband looking for the property. She signed the contract to purchase the property. She was the sole member of the LLC that owned the property. She signed the mortgage for the property. She dealt with the architect. She dealt with the city on behalf of Colville. Carol knew everything about Colville. And if Carol didn't or didn't comprehend it, Dr. Ring brought the plans for the Colville property, his building he was going to build, where the parking was, what was going to be housed in it, retail on the first floor. He brought the plans to a family get-together with not just Carol, but Carol's sister and brother-in-law, Carol's mother and father, Carol's brother, and other people. He laid the plans out at this family get-together to show everybody his grand plan for Colville. This is exactly the information that Dr. Ring based this lawsuit on, claiming Mr. Shanker revealed the Colville information to Carol's attorneys. And in the initial complaint, they expressly pled that Carol had no idea of the existence of Colville until Mr. Shanker told her about it during the divorce case. And interestingly, at the trial of this matter, Dr. Ring was the last witness in his own direct case, and they began the cross-exam by Dr. Ring's attorney saying, and the complaint he filed in this case had some false statements in it, didn't it? Yes. What were they? Carol didn't know about Colville. Carol wasn't a member of Colville. Carol didn't sign any documents for Colville. The entire basis of this case was a sham. Dr. Ring's attorneys quit the case after that was revealed, and now we've morphed into the second amended complaint, which carries those over. That Mr. Shanker's wrongful act was telling Carol's attorneys, calling their attention to Colville as if Carol didn't know about the Colville property that she was listed as the owner of. And the statement that Carol had a problem with this under the prenuptial agreement, and that Mr. Mirabelli felt he couldn't get past the prenuptial agreement, that misstates his testimony. Mr. Mirabelli testified he wanted to enforce the prenuptial agreement other than as it applied to Colville. Why other than Colville? Because under the terms of the prenuptial agreement, section 1.1a, any property held in the name of either Dr. Ring or Carol was the separate property of that person. Mr. Mirabelli admitted it at the trial. He said what's in Carol's name is Carol's. So even in the reply brief that Dr. Ring filed, I don't think he meant to admit it, but he did. He had to reacquire the Colville property. I guess what you're saying is the Colville property would have been otherwise hers. Yes. I mean, and so if he had, so this is, again, it's all spoken mirrors, it seems, with regard to the complaint. Exactly. And Mr. Mirabelli admitted it was hers and admitted he didn't want to enforce the prenuptial as to that portion of it. Mr. Hollander, one moment. One moment, Mr. Hollander. Justice Simon. Mr. Greenberg, I don't know if you have other work that you need to do right now, but your reactions right now are distracting to me. It's as if you're not in this hearing at this moment. It seems that you're working on maybe even a different case. I don't know. But I'm asking that you please stay with us. Stay attentive to this hearing. Also, as Mr. Hollander is speaking, I'm admonishing you not to shake your head from side to side to tell us you're disagreeing with what he's saying. You don't have a right to disagree with what he's saying while he's speaking. You still have time for rebuttal and you'll get a chance to address all of the issues that he's raising. So I'm asking you, please stay with us. So just you don't need me to respond. You may continue, Mr. Hollander. Thank you. So, the TRO did not prevent Dr. Ring from developing CoVal. He claimed it was in place for a year. It wasn't in place for a year. It was in place for less than two months. The settlement wasn't affected by the TRO because the TRO was dissolved seven months before the settlement agreement, as well as any other restriction on CoVal. Dr. Ring was free for the seven months to develop CoVal. He didn't even have the tax abatement he needed to proceed with the project until September of 2013, after the TRO was dissolved. The notion that Mr. Shanker should be responsible for the $400,000 Dr. Ring paid to settle the divorce case is absurd. In parts of Dr. Ring's brief, he states that the $400,000 was paid to reacquire CoVal. Then he admits that that's not the case in a different spot. But the $400,000 was paid for several things. It was paid to settle all of Carol's property claims against Dr. Ring. It was paid for Carol to give up her rights in CoVal, which Dr. Ring made her, in his words, the legal owner. And it was paid to purchase a house. So Carol had the funds to purchase a house for her and the two daughters of the marriage to live in. We've brought this up repeatedly. It was talked about at the trial. And Dr. Ring persists before this court that he's entitled to the whole $400,000 that he paid, including the money he paid to buy a house for his children. And that shows you what Dr. Ring's intentions are in this case. He wanted to get Mr. Shanker to pay to purchase a house for Carol and the daughters. There's no legal basis for that. Let me ask you a question. Let me ask you a question on something Mr. Greenberg said. He said that three experts on legal ethics all agreed that, I believe he said, all agreed that Mr. Shanker had violated Rule of Professional Conduct 1.9. What's your response? That's not true. What he actually said is all the experts agreed that Mr. Shanker violated Rule 1.9 by disclosing information to Carol. And actually, none of the experts said that. Our expert, who was qualified as an expert on legal and accounting ethics, testified that Mr. Shanker not only had the right, he had the duty to disclose the financial information to Carol because she filed a joint tax return with Dr. Ring. And all this financial information was in the tax return or was used to prepare the tax returns because Dr. Ring had a bunch of pass-through entities. So the personal finances of he and Carol were relevant to that. We put in the citation to the Internal Revenue Code. We gave you Elmhurst Supreme Court case law saying information given to an accountant is not only not privileged, it's not confidential. They ignore that. They never once acknowledged the fact that Mr. Shanker prepared and filed the joint income tax returns for Dr. Ring and Carol. Therefore, Mr. Shanker had an obligation to give that information to Carol. As far as the joint tax return, she has a right to all of the backup information, any paperwork that she used to prepare that return. Whether she was aware of it or not, she's entitled to the information. Yes, and the definition of that information in the Internal Revenue Code is probably about a third of the page, single-spaced, all examples of all the information that she's entitled to. Dr. Ring's experts were experts on legal ethics. I don't question the experts, particularly Ms. Robinson. She's an expert in this area for sure and very credible. She admitted she's not an expert in accounting ethics and the opinion she gave in the case had nothing to do with whether Mr. Shanker had the right to provide information to Carol because that information was prepared or came to him as an accountant. Dr. Ring's other experts said the same thing. He wasn't an expert in accounting ethics. So it's really stick your head in the sand. If Mr. Shanker wasn't actually the CPA for Dr. Ring and Carol and hadn't prepared the joint tax returns, then here's my opinion of what would have existed in that circumstance. Knowing that Mr. Shanker was an accountant and got all this information as an accountant, they had no opinion on whether it was proper or improper for Mr. Shanker to disclose that information to Carol. And by the way, it's a small amount of information that he disclosed to her. She had the information. She had the bank records. She had all that sort of thing. She was preparing the records for Dr. Ring's businesses. She was the bookkeeper for the businesses. She was the HR person for the businesses. She knew all this information. And also, let me just, what you're saying, just to get to the correction. Look, the judge thought there was no case. He gave sanctions, not for the pretrial, but for the trial and what happened afterwards because once he heard the evidence, he said, there's nothing here. This is nothing. And that's why I'm sanctioning you. Do you want to talk about, you also are asking that as far as sanctions that you should, why should you get the sanctions for the pretrials? Yes. Okay. Thank you. I will. So, the trial court didn't just find the case was frivolous for failure to prove damages. The trial court specifically found that Dr. Ring never addressed, never established what information Mr. Shanker provided as an accountant and what information he provided as an attorney. Dr. Ring tried the case like he's arguing it before this court, like he put it in his briefs. They ignored the fact that Mr. Shanker was the accountant. So, the trial court found that from a liability standpoint, they didn't prove any part of their case. He found that there were no ethical violations proven. He found there were no damages in the case. He found the entire case was frivolous. Until you just mentioned the sanctions that were imposed, I have no idea how the trial court eliminated those sanctions. I understand from what he heard the evidence on is when he determined the sanctions. But with all due respect, and the trial court wrote a very thorough and persuasive opinion in this case. I'm not trying to diminish that. But that's not a proper measure of damages in this case, where the trial court found, number one, the entire case was frivolous. Number two, all the attorneys fees that we sought in the rule 137 motion were reasonable and necessary in light of the complexity of the case and the amount at issue, what was at issue in the case. The judge made every finding to bring this case within Diane versus McDonald's, where the false pleadings were the cornerstone of the case. And therefore, we should have been awarded the entirety of the attorneys fees and expenses incurred by Mr. Shanker. The amount is $249,690. Judge, the trial court gave us $37,000, about 15% of that. I would respectfully submit that, under the findings made by the court, all of them supported by the evidence, by voluminous evidence, really, in this case, and undisputed evidence, that was against the judge abused his discretion. So, Mr. Hollander, what do you think the judge should have done? I think the judge should have done really exactly what he did, granted the 137 motion, and then based on the finding about the reasonableness and necessity of the fees and expenses, entered a sanction for the $249,690. I believe this court can enter the judgment for that, based on the findings made by the trial court, that the fees, he did consider the reasonableness of the fees and the necessity for the fees, and found that all the fees were reasonable that we claimed in the case. So, in the alternative, I would ask that this be remanded for a determination of a reasonable amount of the fees and costs. However, it seems the trial court already did that. The trial court, you know, Dr. Ring talks about the trial court being prejudiced against him. The trial court gave Dr. Ring a big break, I think, by only awarding 15% of the attorney's fees, and I do believe it was an abuse of discretion to do that. And then, I also believe this case before your honors is an extension of the same valid arguments, ignoring the fact that Mr. Shanker prepared the joint tax returns, sloughing over the fact that, as was pointed out, Dr. Ring didn't just have a failure of the sufficiency of his evidence to support these damage claims. He had no evidence. He just misstated what happened. Let me, if I could give you one example. Before you do that, let me just tell you, you're out of time. I'm going to give you a minute to wrap up. Okay, thank you. One thing I want to mention briefly is Dr. Ring claimed that he bought this immediate property because of what Mr. Shanker did in the divorce case. He actually signed the contract to purchase that property before the divorce case was filed to stop a competitor from opening up a business across the street, which is where that was located. The damages he wants from Mr. Shanker in this case are what he paid for the property, but Dr. Ring owns the property. He didn't claim it went down in value. He has no damages from that. He wants to punish Mr. Shanker by having Mr. Shanker pay for the property purchased and owned by Dr. Ring. For all these reasons, your honors, thank you for your attention. I ask that you affirm the judgment entered by the federal court and affirm the finding of the rule 137 violation and increase the amount of the sanction to $249,690. And thank you very much. Thank you, Mr. Greenberg. And Justice Walker, I just want to, I know you said don't comment, but Mr. Henry is in the room with me. And that's why I initially turned off my video, because he wrote the brief and he has a better understanding that I've acquired of the record on appeal. So, we were conversing back and forth and I was shaking my head. Thank you. We had no idea he was in the room with us. Introducing him as being in the room with you. Right, I'm sorry. So that's what I was shaking my head at and so forth. Okay. And what he did was he did obtain the email. I would refer to it's in the supplemental record he 1677 from Mr. Schenker, which specifically goes to Carol's divorce lawyers and speaks about the project, the cobalt project and describes it as a dream of berries. Before the TRO is entered. I would also point out that they don't totally aware of that cobalt project Mr Greenberg. Okay, I'm sorry what I didn't was totally aware of that cobalt project. That wasn't any information that was provided. That was in violation of some attorney client privilege. No, it's in violation of the duty not to act to adverse to your client under rule 1.9. You can't do things that will that were the transaction is adverse to your client, and that's what he's doing. It's not just a disclosure case. It's a promoting it's an encouraging. It's a helping the other side to go against your former client on the same matter that you represented them on and and he continued to do that it's set forth in the brief. There are a number there's at least 12 different plaintiffs exhibits. There's emails that he sent to the Indiana attorney after the TRO, where he claims that he's representing Carol, with respect to the cobalt property. He set this up. He structured this transaction. Mr Shanker, he structured the transaction in the way that he and Dr ring wanted it structured, and then he tried to use that to help his daughter. He actually tries in the August email August 2013 email to tell the Indiana attorney that in fact, it's his daughter's property. His daughter's in charge of the property. She controlled. I don't understand. I'm sorry what you don't can see that his daughter that property belong to his daughter. That property belong to his daughter in only a most technical sense, because he had set it up that way knowing full well that he was setting up that way to conceal Dr rings ownership of it, and that's whatever that is whether that that is no secret between. Right, but he can't, but he can't then try and help his daughter to act contrary. She was. I don't understand but she was part of that transaction. What where's where's where's something happening that's so he, he, he says, and I know it's a little bit complicated, he says, we're going to set up this business entity. Carol, you're going to be the front person for the business entity, Carol, you know that Dr ring controls this entity, you're doing everything he is, he has the power of direction under the way it's set up at any minute he can say I'm taking your name off it. That's how he sets up the entity. Then he goes when his daughter's getting divorced and he says, you know what, I know this was my clients intent, and I set up this entity under that understanding and I told my client that setting up this entity this way was best for him. And now I'm going to help my other client to take control of this entity from the first client when you're forgetting is this under the prenup. It was heard, it doesn't matter maybe you know that it was maybe lost in the, in the trend. Later on, but the fact is, is I understand that the prenup, put it in her side. So, whatever you say the prenup still is there. So it's still her property, you can't, you can't deny that. What that would be justice if it was, if it was Carol, and Dr ring fighting in the divorce court over who owns the property. That's a different case, and that's where I think the trial court also got lost. That's not what this case is about this case is about Dr rings attorney, taking off the doctor green hat, putting on the Carol hat, and then trying to help Carol in the same transaction to take advantage of the way he set it up after telling Dr ring. I'm setting this up this way for you. And there were damages there was plenty of testimony that there was from the divorce attorney there were time constraints. Dr ring had a business to run his accounts were locked up. There's still that doesn't matter. The judge said there is no evidence of damage. But where's the evidence. I mean, there was testimony about the damages the judge just rejected the damages are $400,000. Now you're saying something different now. The damages were $400,000. Now, it was paid right because the divorce lawyer specifically said that, but for the misconduct, he would have recommended the doctor ring, continue to fight for the prenup to be enforced and not pay anything. That's where he testified to that's on page 410 of the record. But there's also the testimony from her lawyer, I mean the judge doesn't have to accept testimony. Mr Marabelli and not only that, as you know, the judge found the testimony of ring to be not credible, to a far extent, I mean he thought he did was not anything that came out of his mouth he could not. I mean that basically the way I understood what the judge was saying. So, based upon all that mean you got a terrible credibility problem on your side in the jet and you don't really the brief doesn't really even discuss that very well it discusses the fact that he cited testimony that was stricken. He relied and has written really has nothing to do with the credibility. That's a different issue, don't don't confuse that the brief does not talk about the judges finding of Mr. That was not talking about now is something different. I understand that but he didn't reject Mr Marabelli is credibility. And Mr. Maybe. I'm sorry.  Right, I understand that he can make these determinations, and that's why and I'm not trying to complete the issues but that's, he can make these determinations, it doesn't make the claims, privilege the greenberg, you're actually out of time but I'm going to go ahead and give you a minute to wind things up. I would just ask that the court, take a look and and at this in the context in which the case really is, which is, it's an attorney, turning on his own client and using information he received during that relationship to the detriment of his then former client we're dynamic, I agree, but that's what it is and as far as the damages go, while there was testimony of damages I understand the court can reject that it doesn't make it frivolous at all it wasn't something that was just made up. Thank you. Thank you. Okay, thank you both. Great argument, we've enjoyed it. And this hearing is adjourned.